FORD
*vs*
WILLIAMS &c.

*B. & A. Monroe* for plaintiff.

---

CHANCERY.

# Ford *vs* Williams ; Same *vs* Thurman; Same *vs* Dozier.

### APPEAL FROM THE MADISON CIRCUIT.

*Case 144.*       *Fraudulent conveyances. Debtor and Creditor.*

*June 6.*

JUDGE MARSHALL delivered the opinion of the Court.—JUDGE BRECK did not sit in this case.

The nature of the controversy.

THE propriety of the decree in this case depends upon the question whether the conveyance of 141 acres of land, (together with the growing crop and farming utensils, by Schuyler Ford, a debtor to the complainants and others,) to John J. Ford, his brother, should be deemed fraudulent and void as against the creditors of the grantor.

In this case, as in others of a similar character, the question as to the fraudulency of the transaction, is made to involve many subordinate questions as to each of which an issue is made in the pleadings or evidence, or both. These subordinate issues and the evidence bearing upon them, have been considered chiefly with a view to several

principal questions, on which, as we suppose, the void-
ness or validity of the deed should depend. These ques-
tions are: 1. Was the transaction real—that is, was the
deed intended to operate as it purports, an absolute trans-
fer of all title and interest from the grantor to the gran-
tee, without any secret condition or trust for the benefit
of the former? 2. Was there a real *bona fide* considera-
tion to the extent stated in the deed, adequate to the sup-
port of such a transfer by a debtor, having creditors still
unsatisfied? And 3. Was the sale and conveyance made
with the intent, on the part of the grantor, to hinder and
defraud his creditors, and did the grantee concur in this
design?

1. The possession seems to have been changed imme-
diately after the deed. The grantee seems to have had
the exclusive use and enjoyment ever since. And there
is no ground for presuming any secret condition, trust or
reservation of benefit to the grantor, if there was a real,
fair and adequate consideration.

2. The deed expresses the consideration of $1400, paid
and secured to be paid, which is proven to have been a
fair price. It is proved by the draftsman of the deed to
have been made up of the surrender by the grantee, of
three notes on the grantor, amounting, with interest, to
about $800, and by the execution by the grantee, of an
instrument binding him to pay a debt of $260, due from
the grantor to one Blythe, and of a note for the balance,
(of about $340,) payable to the grantor. The subse-
quent payment of the $260 to Blythe, in a settlement of
the price of work previously done for him by the grantee,
is proved; and the note for $340 was, some time after
the commencement of this suit, assigned to Wm. Teeter,
and as may be inferred from his deposition, has been
since satisfied by the maker, by payment or otherwise.
It is proved by M. Q. Ashby that after this and other simi-
lar suits had been brought, S. Ford offered to assign this
note to him, to put it out of the reach of his creditors;
but although this evidence shows a fraudulent intention
with regard to the use of the note, it does not tend to
show that the note itself was not real, or that the payee
did not intend that it should be paid.

FORD
*vs*
WILLIAMS &c.

Circumstances
indicating fraud
critically exam-
ined.

The inquiry then as to the fairness and sufficiency of the consideration is confined to the three notes, amounting, with interest, to about $800, alledged to have been due from Schuyler to J. J. Ford. The first of these notes for $220, bears date in December, 1838, and is attested by Stephen S. Ford; the second for $300, bears date in October, 1839, and the third for $250, in February, 1840. The two last being unattested and all of them without indorsement. The draftsman of the deed says that he calculated the interest upon them and drew the notes for the balance, and negatives the idea, so far as the appearance of the notes would show it, that they had been recently fabricated. There seems to be no reason to doubt that these three notes were actually executed by S. Ford. But they are impeached as not being genuine evidences of real debt existing at the time when they respectively bear date; and this impeachment is attempted to be sustained mainly by proof intended to show that J. J. Ford's circumstances were such as to render it impossible, or at least highly improbable that he had means or could have been a creditor to the extent of these notes, at their respective dates; some suspicion is also attempted to be thrown upon the attestation of the first note, by Stephen S. Ford, and an unfavorable inference with regard to that note, is drawn from the fact, that although Stephen S. Ford's deposition, taken in the absence of the note, was on that ground excluded. So far as it related to the note, leave was obtained to re-take it; it was not re-taken, and before the last depositions were taken on the subject, he had left the State. But although Stephen S. Ford was a younger brother of the grantor and grantee, and then about eighteen years of age, it does not appear that his departure from the State was procured, or could have been prevented by them, or that they knew he was going in time to take his deposition, or that the taking of it was postponed unreasonably, or from any sinister motive. The note itself, with the others referred to, was produced and its attestation by Stephen S. Ford, and its genuineness in other respects, deposed to by Schuyler Ford, in time for taking countervailing testimony; and its execution, about the time it bears date, as well as the consideration on

which it was founded, is moreover proved, not only by Schuyler Ford, but also by Caroline Ford; and the fact that a debt of that amount, from S. Ford to J. J. Ford, existed about that time is corroborated by the testimony of several of the complainant's witnesses, who, in deposing as to the circumstances and means of J. J. Ford, speak of his having mentioned the existence of such a debt about that period. The same fact is also corroborated by other evidence presently to be noticed, relating to the means and the habits of J. J. Ford. We think, therefore, that the debt evidenced by the first note, and the genuineness of that note are sufficiently established.

With regard to the two last notes, and the debts evidenced by them, there is no direct testimony besides that of Schuyler Ford, except that Caroline Ford speaks of a loan from J. J. to S. Ford, of $120, in the summer of 1839, which may have entered into the consideration of the note of October of that year. It appears, however, that during three years, ending with 1838, J. J. Ford had received, as a bricklayer, principally in the City of Lexington, and nearly all of it in money, about eight hundred dollars. Up to this time it does not appear that he had incurred any expenses except merely for living, and being a plain, industrious and economical young man, it might be presumed that he had saved some five or six hundred dollars, principally in money in hand or on loan. His tax list for 1839, referring of course to the 10th of January, (including $300 reserved from taxation by law,) presents the sum of $495, as his own estimate of what he was worth, of which $145 was in horses, and the residue beyond S. Ford's note for $220 was probably in money. About the period just mentioned he married, but did not keep house until about the end of the year 1839. During that year he is proved to have built five houses, two of them at the price of $810, the payment of which is proved; and of the other three there is no separate estimate. But of three witnesses who worked with him on some or all of those jobs, one supposes their gross value to have been $1000; another estimates it at $1100 or $1200, and a third thinks he must have cleared, in 1839, from $700 to $900. His family expenses for

FORD
*vs*
WILLIAMS &c.

It is not fraudu-
lent for one cred-
itor to buy all his
debtor's proper-
ty at reasonably
fair prices, in
satisfaction of
his demand, al-
though he may
know that the
consequence will
be the loss to
other creditors
of their debts.

the year must have been small, and considering the smaller jobs belonging to his business, they probably constituted no charge upon the earnings above referred to.

The value of his horses, on hand at the beginning of the year 1840, seems, from his tax list, to have been about the same as at the commencement of the preceding year. Taking then $1100 as the gross value of his labor, on the five buildings erected by him in 1839, this sum added to $135, on hand at the beginning of the year, will give $1235 as the amount of his means to be accounted for. If the two notes now in question were genuine, an advance of about $505 to Schuyler Ford, would, at the rate of interest which seems to have prevailed between them, and which Schuyler Ford gave in another similar transaction, have been a sufficient foundation for them. In addition to which, J. J. Ford made a partial payment, say $200, for forty acres of land purchased by him in the winter of 1839, and in the summer of 1840 he received in payment of work done in 1839, the notes of S. Ford to Blythe, for $260, which he had bound himself to pay as a part of the consideration of the conveyance now in question, making $965 chargeable upon the fund of $1235, besides the expenses of the year 1839. If the profits of the year were $900, this sum added to the $135 with which he commenced the year, would exceed the payments and loans chargeable upon it. If the profits were only $800 or even $700, the deficit of $30 on one hypothesis or $130 on the other, considering the total means of the year, and the industry and thrift, and the consequent credit of J. J. Ford, would scarcely be sufficient to cast a doubt upon the reality of the alledged loans to Schuyler Ford, much less to disprove them. The expenses of the year were doubtless small ; they may not all have been paid, or debts may have been incurred in paying them, as J. J. Ford may, like other money lenders, have left his own debt unpaid, in order to furnish loans at high interest to a brother who seems to have needed it. His tax list for 1840 shows, that according to his own estimate, his estate had increased in value $655 during the year 1839, the total estimate for the 10th of January, 1840, being $1150 :

but it is not probable that he estimated his demands upon others at their nominal value; and his estimate of his invisible estate would be formed by deducting what he owed from what was owing to him—so that if he was indebted but $100 for the expenses of the year, his tax list might be correct, and his means might have amounted to $1400, which would have been amply sufficient to cover all payments and loans alledged to have been made, leaving nearly $100 to cover the value of his household property.

It is then neither impossible nor improbable that he had the means of making the loans to Schuyler Ford, on which these notes of October, 1839, and February, 1840, are obliged to have been founded. On the contrary, it may be regarded as certain, that he had funds, about that period, considerably beyond any disbursements made for his own use, and which, if they were not invested in the shape of loans, are wholly unaccounted for. It may be assumed also, that at the periods referred to, Schuyler Ford needed money, and it is not to be doubted, that having previously found his brother willing to lend, he obtained from him as much as he could furnish, and probably more than he could prudently spare. There is, it is true, no absolute proof nor demonstration that J. J. Ford had fully $500 to lend beyond all calls upon him for money: but when was such proof required to sustain an alledged loan? Neither is there any direct proof, besides the statement of the parties, that he actually lent that sum to Schuyler Ford: but there is reasonable certainty, that he was able to lend it, and there is no proof that he did any thing else with it. It may be also assumed, that in October, 1839, Schuyler Ford required money for the purchase and expenses of a drove of hogs, taken that fall to market; and there is great probability that he should have gone to J. J. Ford for a partial supply of his wants. The adventure with the hogs seems to have been disastrous, and returning in the winter, without money enough to pay for his purchases of the previous fall, it is highly probable that he should again apply to J. J. Ford; and the payments made in February, may have been, in part, supplied by the alledged loan of the first of that

month. When to all these probabilities is added the production of the notes themselves, for a calculation of interest by the draftsman of the deed, and the testimony which their appearance bore to their genuineness in point of date, and the oath of Schuyler Ford, to the reality of the loans, and the truth of the notes, we think all this, together with the undoubted payment of $260 to Blythe, the execution of the note for $340, the balance of the purchase money, and the absolute enjoyment of the land by J. J. Ford, from the date of the deed, and his sale as soon as could be, of the 40 acres of land, which he had purchased but a few months before, makes out a case of reasonable certainty as to the reality of the consideration on which the conveyance is alledged to have been founded. There may, it is true, be some ground for suspecting, that after this suit was brought, J. J. Ford may have cooperated in securing to Schuyler Ford the benefit of the note for $340 just named, which, however, was not attached: but if he did so, the fact that the deed itself disclosed his indebtedness to Schuyler Ford, and that the note was actually held by the latter for a considerable time, during which it might have been attached by creditors, is sufficient to prevent this suspicion from having any serious bearing upon the reality of the transaction.

3. We come then to the question, whether this conveyance was made with intent on the part of the grantor and grantee, to hinder and defraud the creditors of the former? And upon the latter branch of this question, (as to the participation of the grantee,) what has been said with regard to the reality of the transfer, and of the consideration, has a most important bearing. For although a conveyance, founded upon a real and adequate consideration, and accompanied by an actual and unconditional transfer of the possession and enjoyment of the property conveyed may be void on account of the fraudulent intent of both parties to hinder and delay the creditors of the grantor, yet it would seem that this could scarcely be the case, unless it were the intent of both parties, or the obvious, or at least the probable effect of the transaction, to withdraw from the reach of creditors, not only the property conveyed, but also the consideration of the transfer.

It would seem to be scarcely possible that a real exchange of a debtor's land for other land in the same county, or even in a neighboring county of equal value, and equally secure in point of title, could, on account of any interest of the parties, be deemed fraudulent and void as to his creditors. And so, if a debtor, however much embarrassed, were to convey all his property at fair prices, in payment to a single creditor, parting absolutely with the possession and all interest, present or future, and receiving only an acquittance from so much of that debt as might be thus paid, we apprehend, that although the obvious effect of such a transaction, and although also, the intent of the grantor might be to defeat other creditors in the collection of their debts ; and although the grantee, if he knew that he was receiving all the debtor's property, might be regarded as at least acquiescing in this intent, such a conveyance could not, merely on the ground of such knowledge and acquiescence, be declared fraudulent and void as to the other creditors. One creditor has a right to demand and receive the property of his debtor in payment, though he may know that he will thereby withdraw the means of satisfying other creditors, and although the immediate inducement for his receiving such payment be the fear or the knowledge that if he do not thus act other creditors will intervene, and by the prosecution of their legal remedies or otherwise, deprive him of the means of satisfaction. The utmost good faith required of the creditor, in seeking or receiving this advantage, is that he shall have acted with a real view to the security of his own actual debt—that he should have allowed adequate prices for the property, and that he should not hold it for the debtor's benefit.

Where there is a real and unconditional transfer of the debtor's property, at fair prices, in payment of a real debt, covering its whole value, the law will presume that the creditor, thus receiving the property, acted with a view to his own security, and this presumption will be stronger in proportion as the danger of loss is imminent. If there could co-exist with these circumstances such a fraudulent intent on his part as would avoid the transaction as to other creditors, we are satisfied that it could not be in-

Where there is a real, unconditional transfer by a debtor of his property, in satisfaction of real debts, covering its whole value, the law will presume that the creditor acted with a view to his own security; and though the debtor may have

desired not only to pay the one, but to defeat other creditors, it will not make the transfer void for fraud, without other proof of a fraudulent intent by the transferree.—

ferred from the circumstances stated, though connected with the additional facts that the debtor desired and intended not merely to pay the favored creditor, but to defeat others, and that the favored creditor. was aware of this intent, and knew that such would be the effect of the transaction. It is not sufficient that he knows the double intent of the debtor, and that he concurs in the act by which that intent, in both its aspects, is effectuated. He must have concurred in the illegal intent before he can be involved in its consequences. And as his own interest furnishes a legal and pressing motive for his concurrence in the act, that concurrence cannot be regarded as proof, even presumptive, of his participation in the sinister intent, but such participation must be clearly proved by independent evidence or facts, unless the fraudulent intent, being expressed in the deed itself, the acceptance of the deed might prove a connivance in that intent.

. The case of a mere purchase of the debtor's property by a stranger, giving in exchange money or obligations for money, is not so strong as that which has been just considered, because it is not the necessary effect of the transaction to discharge any debt of the grantor, and because the mere concurrence of the grantee in the conversion of the debtors property from that which is visible to that which is invisible, may, under many circumstances, furnish strong presumption of a fraudulent intent on his part, as well as on that of the grantor, to hinder and delay the creditors of the latter. But where the necessary effect of the transaction is to secure the application of the full value of the property purchased to the discharge of certain debts of the grantor in a manner satisfactory to the holder of those debts, the case would seem to be scarcely distinguishable from that of a conveyance to the creditor himself in discharge of a real debt, and at a fair price. Where a part only of the debtor's property is thus conveyed to his creditor, or to a purchaser, securing the payment of his debts, the difficulty of imputing fraud is increased.

—And the transaction will be equally sustain-

Assuming, as we are authorized to do, that there was a real debt from Schuyler to J. J. Ford, as alledged; that the transfer of the property conveyed by the deed was

intended to be and was in fact unaccompanied by any secret trust or condition, and that the price paid and secured was adequate, the present case partakes obviously of the features of each of the three cases which have been stated, and most strongly of the first and last, which are in themselves the most impregnable; for J. J. Ford was the creditor of S. Ford to the amount of more than one half the value of the property conveyed, and the extinguishment of this debt constituted more than half of the consideration of the conveyance. To the extent of nearly one half of the residue of the consideration he bound himself to pay, and did in fact pay, in seasonable time, other debts of the grantor; and for the balance, he executed his own note, which, by being virtually made known to the world on the face of the deed, was in effect placed within the reach of other creditors of the grantor. Conceding then, that he knew that Schuyler Ford was indebted beyond his means; that his creditors would be shortly pressing upon him, and that to defeat some of them and to secure others, he intended to convert or to cover over with mortgages and deeds of trust, his whole visible estate—did not this knowledge, admitting that he possessed it to the fullest extent, furnish the strongest motive for his attempting to secure himself in the best way he could? And shall the transaction, by which he did secure himself, be ascribed, merely on the ground of this knowledge of the condition and intent of the debtor, to the fraudulent motive on his part, of hindering or defrauding other creditors? The transaction itself, by which more than three-fourths of the value of all the property conveyed to him was appropriated to the discharge of the grantor's debts, and the residue left exposed to a similar appropriation, by the action of the creditors themselves, absolutely negatives such an inference from the fact assumed, and, as we think, sufficiently repels the effect of those minor circumstances which, if there had been no debt between the parties, might have been calculated to involve the grantee in the imputation of fraud.

Schuyler Ford says, in his deposition, that J. J. Ford had wished to take a part of the tract of 141 acres in payment of his debt, but that he refused to let him have any

ed if a creditor, by *bona fide* purchase, without any secret trust for the benefit of the debtor, in part of the price paid other debts, or give his note for money.—

unless he would take it all. This statement and the emergency of the case sufficiently accounts for the purchase actually made, and explains the apparent inconsistency which was much insisted on, that he had purchased the whole tract only a short time after he had avowed among the neighbors his unwillingness and perhaps inability to take more than thirty or forty acres of it adjoining the forty acres which he had already bought. His purpose then was, to retain his forty acres and to add to it from his brother's tract: He was in truth unable, without imprudence, to retain the first and purchase the whole or a large part of the other. He could not, even with the expectation of selling the forty acres, purchase the whole of the 141 acres without danger of embarrassment. And yet when the alternative was presented of losing his $800 or encountering this danger, it was not strange that he should adopt the latter alternative, and give up, as he did, his original forty acres.

Another circumstance relied on as stamping this deed with the character of fraud is, that at the same time at which the deed now in question was written and executed, two other deeds were written by the same draftsman, and executed by Schuyler Ford, one of them a deed of mortgage for securing three debts, one of which only was truly stated, while a second was considerably exaggerated, and the third was almost entirely fictitious ; and the other was a deed of trust for securing several debts, all admitted to be just. The three deeds together, included nearly every article of property which he was known to possess. But surely the circumstances that these three deeds, to different individuals, were executed by the same grantor, at the same time, even if it proves that they were all parts of the same scheme or system on the part of the grantor, does not make them all one transaction, as to the grantees, nor identify them so completely as to involve them all in the same fate. The deed of trust, we believe, has not been assailed. Even the mortgage has been properly sustained, so far as the debts therein named were real, though declared void as to the others. The real creditors did not concur in the fraud ; and if this deed were to take its character and fate entirely from those of

—Nor will the fact that other transfers of property by mortgages or deeds of trust were made at the same time, partly on good and partly on fictitious considerations, to others, conveying all the debtor's property, affect a valid conveyance for good consideration, without fraud, so far as grantee is concerned.

its associates, why should it not rather be saved with the deed of trust and the major part of the mortgage, than condemned with the unsound part of that instrument? But the facts, as stated above, certainly do prove that S. Ford intended to secure certain just debts, and that for the purpose of covering his property from less favored creditors, he raised up certain fictitious debts to furnish a part of the consideration of the mortgage. He says that he made these deeds for the purpose of paying and securing just debts, and that he expected or hoped that his partner (in the hog speculation,) would bring funds to pay the partnership debts, which were left unsecured and are attempted to be enforced in these three consolidated suits. This of course was no excuse for raising a fictitious consideration for the mortgage; and there is certainly some ground for inferring that one motive on his part for securing even just debts by the execution of all of these deeds was to hinder and delay, if not to defeat other debts equally just. But if J. J. Ford was a real creditor, as we have assumed, and if his purchase, as shown by his deed and explained by the facts, was also real, it has already been seen that even his knowledge of such a motive on the part of the grantor, could not invalidate the conveyance to him. Nor can it be admitted that his deed would be affected even by his knowledge that a consideration, in part fictitious, was inserted in the mortgage. But although present when all the deeds were written and executed, he had no interest in the mortgage or deed of trust, and took no part in dictating them, nor does it appear that he knew before hand that such instruments were to be prepared, nor that his attention was, in any manner, drawn to the debts named in the mortgage. If, under these circumstances, it should be inferred that he knew that a consideration, partly fictitious, had been inserted, (or even if he knew beforehand that it was to be inserted,) and if upon this ground some suspicion might arise as to the consideration of his own deed, there is, as to a great part of that consideration, too much of absolute certainty, and as to the residue, too much of strong probability for the question as to its reality to be affected by so slight a suspicion. And so as to other

minor circumstances, it is sufficient to say that, in our opinion, the proof of the reality of the consideration and of the transfer, as imported by the deed, is sufficiently strong to overcome the various circumstances relied on to sustain the imputation of fraud, and which, although they may be calculated to throw some suspicion on the transaction, are deemed insufficient to invalidate it. There is no evidence of a fraudulent intent on the part of J. J. Ford, sufficient to destroy a deed founded on an adequate consideration, of which three-fourths is secured to the grantor's creditors, and the other fourth left open to their remedies.

Wherefore, the decree is reversed and the cause is remanded, with directions to dismiss the various bills and amended bills of the complainants in these three consolidated suits, so far as they seek to subject the land or personalty conveyed to J. J. Ford, by the deed of Schuyler Ford, above referred to: but without prejudice to their remedy for attaching any debts which may be due by J. J. Ford to Schuyler Ford.

*Owsley & Goodloe and Caperton* for appellant: *Turner* for appellees.